IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE



FILED

November 1, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

STEVEN A.  WAKEFIELD,              )       **FOR PUBLICATION**
                                   )
        Plaintiff/Appellee,        )       **Filed: November 1, 1999**
                                   )
v.                                 )
                                   )       Blount Chancery
MICHAEL F.  CRAWLEY, MacTENN       )
VALVE COMPANY, a Tennessee         )
Corporation, and MACAWEBER         )       Hon.  Chester S.  Rainwater,
SYSTEMS, INC., a Tennessee         )       Chancellor.
Corporation,                       )
                                   )
        Defendants/Appellants.     )       NO.  03S01-9903-CH-00029

For Plaintiff-Appellee:

H.  Allen Bray
Maryville, Tennessee

For Defendants-Appellants:

William S.  Lockett, Jr.
Kennerly,Montgomery & Finley,PC
Knoxville, Tennessee

# O P I N I O N

TRIAL COURT AND COURT OF APPEALS REVERSED;
CAUSE  DISMISSED                                          DROWOTA,
                                                         J.

We granted this appeal to determine whether stock in a closely-held corporation is a "security," as defined by Tenn. Code Ann. § 47-8-102 (1992 Repl. & Supp. 1998)[1], so that Chapter 8 of the Uniform Commercial Code (UCC) governs its sale or transfer. In Blasingame v. American Materials, Inc., 654 S.W.2d 659, 664 (Tenn. 1983), we concluded that closely-held stock was not a security within the meaning of Chapter 8 of the UCC. Because we have determined that the Official Comments of the 1977 version of the UCC, adopted by the Tennessee General Assembly in 1986, as well as the 1995 and 1997 amendments to the Code, overrule the reasoning in Blasingame, we now hold that closely-held stock is a security within the meaning of the UCC's Chapter 8, and that the closely-held stock at issue in this case is governed by Chapter 8. Because the plaintiff cannot produce a signed writing that comports with the statute of frauds found at Tenn. Code Ann. § 47-8-319 (1992 Repl. & 1996 Repl.), nor can he satisfy one of the statutory exemptions, we reverse the judgments of the lower courts and find in favor of the defendant.

## FACTS AND PROCEDURAL HISTORY

The parties in this action became acquainted in 1986 when the defendant, Michael Crawley, acting through Macawber Engineering, Inc., a corporation of which he was the sole shareholder, became involved with a project involving the development of technology to clean the accumulation of impure residue in coal mines. Mr. Crawley approached the plaintiff, Steven Wakefield, an investment banker, and solicited his help in obtaining financing for the project. While the mining project never materialized, the defendant enlisted the plaintiff's assistance in financial consulting. Specifically, the defendant sought help in revamping

---

[1] The transactions in this case are governed by Tenn. Code Ann. § 47-8-102 as it existed in the 1992 Replacement volume. Although the statute has been amended several times since appearing in that volume, our holding also applies to the statute's current version, found in the 1998 Supplement.

Macawber Engineering's failing financial situation. Without a formal employment agreement between the parties, the plaintiff assented to assisting the defendant, and began consulting with creditors in an attempt to obtain financing for various company projects.

Between 1987 and 1992 the plaintiff continued to perform financial consulting for Macawber Engineering. In compensation for his services, the parties agreed in September 1990 that the plaintiff would be placed on the corporation's payroll and would receive $10,000 per month. That fee was later reduced to $6,000 per month, and finally to $4,000 per month due to the company's strained financial situation.

By 1991 Macawber Engineering continued to struggle financially and was on the brink of bankruptcy. The plaintiff maintained that in order to remedy the corporation's poor image and financial status and to protect its creditors it was essential to create a "clean" company that would be more successful at obtaining and performing contracts. The defendant agreed that the employees and creditors of Macawber Engineering would best be protected if the company could exist and transact business in a different form. To achieve this, the plaintiff suggested that two new companies be formed. Accordingly, Macawber Systems, Inc. ("MSI") and MacTenn Valve Company ("MacTenn") were incorporated during 1991 and 1992. The defendant was the sole shareholder in each new corporation.

The defendant, an engineer, contends that he was ignorant about the nuances of this transaction and that he was completely dependant upon the plaintiff and Frederick Gertz, an attorney whose help the plaintiff had enlisted, in implementing the necessary corporate changes. The defendant asserts that in 1991 and 1992 he was instructed by the plaintiff and Mr. Gertz to prepare a series

3

of documents that would facilitate the creation of the new corporations and would transfer licenses and assets so that the businesses could continue to operate. The plaintiff and Mr. Gertz provided the defendant with a list of documents to be prepared, the compilation of which the defendant describes as a "bogus stock transfer." The documents represented several ongoing transfers that were made over an extended period, including transfers of intellectual property, technology licenses, patents and certain company rights. Some of these rights were transferred from Macawber Engineering to the defendant, in his personal capacity; others were transferred directly to the new corporations. The defendant asserts that the plaintiff and Mr. Gertz advised him to backdate the documents six months "in order to establish some kind of period that was necessary to preserve the authenticity of the agreements."

Although the defendant contends that he was confused about the legal implications of preparing agreements in this manner, he drafted the documents in accordance with the plaintiffs' and Mr. Gertz's instructions. However the defendant, under the belief that the agreements were mere "contingency documents," did not execute any of the forms but merely presented them to the plaintiff without having signed the documents. The defendant asserts that during this period he had grown distrustful of the plaintiff and had begun to question the motivation behind the request for the documents he had prepared. As a result, when the plaintiff and Mr. Gertz requested stock certificates representing certain stock in MSI and MacTenn, the defendant provided only copies of the original certificates and hid the originals.

The parties engaged in an ongoing dispute in 1992 regarding the plaintiff's compensation for his financial consulting services. A series of letters were exchanged in which the plaintiff expressed his understanding that he was to receive $250,000 as payment for past services. The defendant maintained that

4

any payments to the plaintiff were conditioned upon the successful sale or refinancing of certain company stock to investors, a contingency which did not occur. The plaintiff disputed this, asserting that his fee was fixed. The parties agree that no written, mutual agreement resulted from these letters. After this exchange, relations between the parties deteriorated.

The parties also disagree about the existence of an oral agreement whereby the plaintiff was to be compensated through a percentage of each new corporation's stock. The plaintiff contends that in compensation for the financial consulting he had already provided, and in order to entice him to continue seeking capital for the companies, the parties agreed that he would receive eighty percent of MSI's stock and eighty percent of MacTenn's stock. The defendant denies that such an oral agreement was reached. Frustrated by the ongoing disputes and a perceived lack of adequate compensation, the plaintiff severed the parties' relations in the summer of 1992.

On May 28, 1993, the plaintiff filed suit against Michael Crawley, MacTenn and MSI in the Chancery Court for Blount County, asserting that he was the owner of eighty percent of each new corporation's stock and seeking an order to enforce the delivery of the stock certificates. The defendant responded by denying that the plaintiff possessed any ownership in the two corporations and asserting certain defenses, including the statute of frauds under Tenn. Code Ann. § 47-8-319 (Repl. 1992). Following a bench trial, the trial court, applying the rule of practical construction, determined that the parties' conduct indicated the existence of an oral agreement that the plaintiff was entitled to receive the certificates in question. The court deemed the statute of frauds to be inapplicable to these facts.

The Court of Appeals affirmed the judgment in favor of the plaintiff,

declaring that clear and convincing evidence supported the trial court's finding that an oral agreement existed between the parties. The intermediate court then addressed the applicability of the statute of frauds governing contracts for the sale of securities, found at Tenn. Code Ann. § 47-8-319 (Repl. 1992). Relying on Blasingame v. American Materials, Inc., 654 S.W.2d at 659, the Court of Appeals determined that the stock at issue was not a "security" within the meaning of Chapter 8 of the UCC because it was closely-held stock, and that the statute of frauds in the chapter did not apply. After concluding that the oral agreement was not rendered unenforceable for any other reason, the intermediate court affirmed the judgment in favor of the plaintiff.

We granted the defendant's application for permission to appeal in order to determine whether the stock of a closely-held corporation is a "security" under Tenn. Code Ann. § 47-8-102 (1992 Repl. & Supp. 1998). Because we have determined that the Official Comments of the 1977 version of the Uniform Commercial Code, adopted by the Tennessee General Assembly in 1986, as well as the 1995 and 1997 amendments to the Code, overrule the reasoning in Blasingame v. American Materials, Inc., 654 S.W.2d at 664, we hold that closely-held stock is a security within the meaning of Chapter 8 of the UCC. Accordingly, we conclude that the statute of frauds found at Tenn. Code Ann. § 47-8-319 (Repl. 1992) applies to the transactions in this case. Because the plaintiff cannot produce a signed writing that comports with the statute, nor can he satisfy one of the statutory exemptions, we reverse the judgments of the trial court and Court of Appeals and find in favor of the defendant.

## ANALYSIS

### A. Standard of Review

6

We begin by articulating the applicable standard of review. Directed by Tenn.R.App.P. 13(d), we must first make a de novo review of the trial court's findings of fact, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. See Walker v. Saturn Corp., 986 S.W.2d 204, 207 (Tenn. 1998). In this case we are called upon to interpret a statutory scheme. Issues of statutory construction are questions of law, see Jordan v. Baptist Three Rivers Hosp., 984 S.W.2d 593, 599 (Tenn. 1999); Beare Co. v. Tennessee Dep't of Revenue, 858 S.W.2d 906, 907 (Tenn.1993), and shall be reviewed de novo without a presumption of correctness, see State v. Levandowski, 955 S.W.2d 603, 604 (Tenn.1997); Ridings v. Ralph M. Parsons Co., 914 S.W.2d 79, 80 (Tenn.1996).

## B. The Blasingame Decision

In this Court, the defendant's primary contention is that the Court of Appeals' reliance on the Blasingame case is misplaced. The defendant asserts that to the extent that Blasingame holds that stock in a closely-held corporation is not a "security" under the UCC, the case was statutorily overruled in 1986, when the Tennessee General Assembly adopted the 1977 version of the UCC. We agree with the defendant's contention.

The plaintiff in Blasingame claimed that the defendant, American Materials, Inc., orally promised him, in addition to other incentives, an option to purchase one-fourth of its stock in exchange for the plaintiff's employment with the corporation. Although the plaintiff assented to the terms of the offer and worked for the company for seven years, he was continually denied an opportunity to purchase the stock. The plaintiff finally filed suit, seeking the value of the promised shares. At trial the plaintiff attempted to introduce a letter from one of the shareholders acknowledging the agreement concerning the stock purchase

7

option.  The defendant corporation insisted that the letter was barred by the statute of frauds governing the sale of securities, found at Tenn. Code Ann. § 47-8-319  (1979 Repl.), and sought to amend its answer to raise that defense.   This Court assented to hearing the case in order to decide whether the stock in a close corporation is a security under Chapter 8 of the UCC, and consequently, whether the statute of frauds governing that chapter applied to the alleged option agreement.

This Court determined that the defendant corporation's stock did not meet the definition of a "security" under the 1962 version of the Uniform Commercial Code, adopted by the Tennessee General Assembly in 1963,[2] because it was not "of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment."  Tenn. Code Ann. § 47-8-102(1)(a)(ii) (1979 Repl.).   The Court focused on the fact that there had been only one sale of stock in the corporation's history and that it was clear that "there was no market available for this stock." Blasingame, 654 S.W.2d at 664.   This Court concluded that whether the stock in a closely-held corporation was dealt with or recognized in accordance with the definition found at Tenn. Code Ann. § 47-8-102(1)(a)(ii) (1979 Repl.) and could be considered a security under the UCC is a question of fact.

## C. Changes in the UCC since the Blasingame Decision

In 1986 the Tennessee General Assembly adopted the 1977 version of the UCC,[3] which is the version that governs the transactions in this case.  The 1977 version departed from its predecessor by creating two categories of securities -

---

[2]See Act of March 8, 1963, ch. 81, 1963 Tenn. Pub. Acts 243.

[3]See Act of April 15, 1986, ch. 737, 1986 Tenn. Pub. Acts 571.

certificated[4] and uncertificated[5].  The definition of a "certificated security" remained identical to the previous version; the definition of an "uncertificated security" deleted the language mandating that the interest be "commonly recognized in any area in which it is issued or dealt in as a medium for investment."  Tenn. Code Ann. § 47-8-102(1)(b)(ii) (Supp. 1986).[6]  The defendant insists that the revised definition of a security clearly encompassed stock in closely-held corporations, and that the General Assembly's adoption of the 1977 UCC overruled the holding in Blasingame.

As support for this contention, the defendant points to the Official Comments accompanying the text, in which the drafters of the 1977 UCC specifically address the effect of the definition changes on the stock of closely-held corporations.  The comments instruct that

> [i]nterests such as the stock of closely-held corporations, although they are not actually traded upon securities exchanges, are intended to be included within the definitions of both certificated and uncertificated securities by the inclusion of interests 'of a type' commonly traded in those markets.[7]

The defendant insists that the General Assembly's adoption of this version of the Uniform Commercial Code signals its disapproval of the holding in Blasingame that closely held stock is not a security under the UCC unless certain factual inquiries were satisfied.

At least one author agrees.  In an article urging Tennessee courts to expressly overrule Blasingame and hold that the stock of closely-held corporations

---

[4]See Tenn. Code Ann. § 47-8-102(1)(a)(ii) (Supp. 1986).

[5]See Tenn. Code Ann. § 47-8-102(1)(b)(ii) (Supp. 1986).

[6]The Official Comments following the section explain that the purpose of this omission was to exclude certain interests, such as checking and savings accounts, that "would [otherwise] be classified as securities under the umbrella of the omitted phrase." See U.C.C. § 8-102, Comments to Official Text, n.2. (1977).

[7]See U.C.C. § 8-102, Comments to Official Text, n.2 (1977).

9

should be considered a security for UCC purposes, one author has emphasized that "[t]he drafters [of the UCC], recognizing that certain courts followed the Blasingame rationale, inserted the Comments to clarify their position. The language 'of a type' is the part of the definition that allows closely held stock to fall within its parameters."[8]

While not controlling authority, the Official Comments to the UCC provide guidance in construing statutory language and offer assistance in discerning the intent of the legislature in adopting the statutory scheme. See Smith v. First Union Nat'l Bank of Tennessee, 958 S.W.2d 113, 116 (Tenn. Ct. App. 1997). This Court has looked to the Official Comments when interpreting the meaning of certain UCC provisions. See Lane v. Doe, 767 S.W.2d 138, 140 (Tenn. 1989); Continental Bankers Life Ins. Co. of the South v. Bank of Alamo, 578 S.W.2d 625, 630 (Tenn. 1979); International Harvester Company v. Carr, 466 S.W.2d 207, 209 (Tenn. 1971). Moreover, Tenn. Code Ann. § 47-1-102(1) (1996 Repl.) directs that "[i]n any dispute as to the proper construction of one or more sections [of the UCC], the Official Comments . . . shall constitute evidence of the purposes and policies underlying such sections . . . ." Accordingly, we will refer to the Official Comments in this case as persuasive authority in discerning legislative intent.[9]

Interestingly, when the General Assembly adopted the 1977 version of the

---

[8]See Tracy A. Powell, Stock in a Closely Held Corporation: Is It a Security for Uniform Commercial Code Purposes?, 42 Vand. L. Rev. 579, 602 (1989).

[9]Other courts have looked to the Official Comments to conclude that stock in closely-held corporations meets the definition found in the UCC. See In re Hryniewicz, 222 B.R. 14, 18 (Bankr. D. Conn. 1998); Allen v. Coates, 661 So.2d 879, 882 (Fla. Dist. Ct. App. 1995); Haught v. Lante Corp., No. 9-C-02342, 1991 WL 148198, at *2-3 (N.D. Ill. July 26, 1991); Medesco, Inc. v. LNS Int'l, Inc., 762 F. Supp. 920, 923 n.4 (D. Utah 1991); In re Domestic Fuel, 70 B.R. 455, 462 (Bankr. S.D.N.Y. 1987); Katz v. Abrams, 549 F.Supp. 668, 671(E.D. Penn. 1982); Dionisi v. DeCampli, No. 9424, 1991 WL 118185, at *3 (Del. Ch. July 2, 1991), amended by Dionisi v. DeCampli,, No. 9425, 1996 WL 39680 (Del. Ch. Jan. 23, 1996); Thompson v. Kohl, 453 S.E.2d 485, 487 (Ga. Ct. App. 1994); United Indep. Ins. Agencies, Inc. v. Bank of Honolulu, 718 P.2d 1097, 1102 (Haw. Ct. App. 1986); Bahre v. Pearl, 595 A.2d 1027, 1035 (Me. 1991); Kenney v. Porter, 604 S.W.2d 297, 301 (Tex. Ct. App. 1980); Wamser v. Bamberger, 305 N.W.2d 158, 162 (Wis. Ct. App. 1981).

UCC in 1986, the official Annotated Code[10] did not include the drafters' comments quoted above.[11] The Official Comments did not appear in the official statutory compilation until the 1992 Replacement volume, representing the Code that governs the transactions that are the subject of this suit. When asked, the Tennessee Code Commission could not provide an explanation as to why the comments were omitted from the 1986 compilation,[12] and we do not view their omission as being indicative of legislative intent. At least one court has held that a legislature's failure to adopt the Official Comments to the UCC does not render the comments insignificant in interpreting the Code. See In re Appeal of Copeland, 531 F.2d 1195, 1203 n.4 (3d Cir. 1976).

The General Assembly's intent concerning closely-held stock was clarified later, in 1995, when it amended the definitions of both certificated securities and uncertificated securities to include language that encompassed the stock of closely-held corporations.[13] Although the 1995 amendments are not applicable to the facts in the instant case, we attach significance to the comments surrounding the changes because they provide guidance as to the intent of the legislature in adopting the 1977 version of the Code. In enacting the 1995 amendments, the General Assembly stated that

---

[10]Tenn. Code Ann. § 47-8-102 (Supp. 1986).

[11]See Powell, supra note 8, at 599 n. 159.

[12]Id.

[13]Tenn. Code Ann. § 47-8-102(1)(a)(ii) was amended to provide that certificated securities were "[e]ither stock of a corporation (regardless of whether publicly traded and without regard to shareholders' agreements, bylaw provisions, transfer restrictions or other such matters applicable thereto) or any other share, participation or other interest or obligation of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment . . . ."

Tenn. Code Ann. § 47-8-102(1)(b)(ii) was amended to provide that uncertificated securities were "[e]ither stock of a corporation (regardless of whether publicly traded and without regard to shareholders' agreements, bylaw provisions, transfer restrictions or other such matters applicable thereto) or any other share, participation or other interest or obligation of a type commonly dealt in on securities exchanges or markets . . . ."

11

> [t]he provisions of this act are intended to be a clarification of existing law with respect to the definition of a 'security' under Article 8 of the Tennessee Uniform Commercial Code, particularly in the context of perfection of a security interest in stock or other investment instruments by possession of the instrument. The intent is to remove any uncertainty created by language of the Tennessee Supreme Court in the case, Blasingame v. American Materials, Inc., 654 S.W.2d 659 (Tenn. 1983).[14]

The General Assembly apparently sought to put an end to the "uncertainty" created by the Blasingame decision by expressly including the stock of closely-held corporations in the definition of a security. Because the 1995 amendments were "intended to be a *clarification of existing law*,"[15] it is clear that the previous version of the UCC - the version that governs this case - was also intended to encompass closely-held stock.[16]  It follows that the holding in Blasingame cannot be reconciled with either the 1977 version of the Uniform Commercial Code nor with the subsequent versions, including the one currently in effect.[17]

Although the current version of the UCC is not controlling in this case, we find it significant to note that in 1997 the General Assembly, acting to delineate rules for determining whether an interest is a security or merely a financial asset, streamlined the definition of "security" found at Tenn. Code Ann. § 47-8-102 (15) (Supp. 1998) and enacted Tenn. Code Ann. § 47-8-103 (Supp. 1998), which provides that "[a] share or similar equity interest issued by a corporation, business

---

[14]See Act of April 6, 1995, ch. 86, § 3, 1995 Tenn. Pub. Acts, 120; Tenn. Code Ann. § 47-8-101, Compiler's Notes (1996 Repl.).

[15]See id. (emphasis added).

[16]The Court of Appeals observed that the Blasingame decision "apparently gave birth to the 1995 amendment to T.C.A. § 47-8-102," and that even if Blasingame had been statutorily overruled by the 1995 amendment to the UCC, "it cannot be applied retrospectively." The Court of Appeals evidently considered the 1995 amendments to be the first indication that the legislature intended the Code to include closely-held stock as a security under the UCC. As we have stated, closely-held stock came within the ambit of UCC securities in Tennessee in 1986, when the legislature adopted the 1977 version of the UCC. The 1995 amendments merely clarified that position. Therefore the law that closely-held stock is a UCC security controls the facts in this case.

[17]The General Assembly's most recent revisions to the definition of a security in Chapter 8 appear at Tenn. Code Ann. § 47-8-102(15) (1998 Supp.) and were adopted in 1997. See Act of April 14, 1997, ch. 79, 1997 Tenn. Pub. Acts 109.

12

trust, joint stock company, or similar entity is a security."[18]  In the Comments to the Official Text, the drafters explain that the provision "establishes an unconditional rule that ordinary corporate stock is a security.  That is so whether or not the particular issue is dealt in or traded or securities exchanges or in securities exchanges [sic] or in securities markets.  *Thus, shares of closely held* [sic] *are Article 8 securities.*"[19]

We believe that by adopting the 1977 version of the UCC the General Assembly signaled its intent that the stock in closely-held corporations meet the definition of "security" under the UCC.  This intent was clarified by the legislature's amendments to the Code in 1995 and 1997 and by the accompanying comments.  Accordingly, we hold that the stock of closely-held corporations is a security within the meaning of Tenn. Code Ann. § 47-8-102 (Supp. 1998).  Because this conclusion cannot be reconciled with our holding in Blasingame, that case is overruled to the extent that it stands for the proposition that closely-held stock is not a security within the meaning of the UCC.[20]

### D.  Other Jurisdictions

Our holding brings Tennessee within the majority of states that have addressed this issue and have concluded that the stock of a closely-held

---

[18]Tenn. Code Ann. § 47-8-103(a) (Supp. 1998).

[19]Tenn. Code Ann. § 47-8-103, Comments to Official Text, n.2 (Supp. 1998) (emphasis added).

[20]Also important to note is that two decisions relied on by the Blasingame court have been overruled.  Zamore v. Whitten, 395 A.2d 435 (Me. 1978) was overturned by Bahre v. Pearl, 595 A.2d at 1035 and Kenney v. Porter, 557 S.W.2d 589 (Tex. Ct. App. 1977) was overturned by Kenney v. Porter, 604 S.W.2d at 301-02.

corporation is a "security" under the UCC.[21]   See Giuffre Org., Ltd. v. Euromotorsport Racing, Inc., 141 F.3d 1216, 1218 (7th Cir. 1998); In re Hryniewicz, 222 B.R. at 18;  In re Turley, 213 B.R. 857, 861 (Bankr. C.D. Cal. 1997) (holding that closely-held stock is a security under Chapter 8 of California's UCC) (rev'd on other grounds, 172 F.3d 671, 675 (9th Cir. 1999)(reversing on other grounds but also finding that closely-held stock is a security for UCC purposes); Haught v. Lante Corp., 1991 WL 148198, at *2-3; Medesco, Inc. v. LNS Int'l, Inc., 762 F. Supp. at 923; In re Domestic Fuel Corp., 70 B.R. at 462; In re Sandefer, 47 B.R. 133, 138 (Bankr. N.D. Ala. 1985); Data Consultants, Inc. v. Traywick, 593 F.Supp. 447, 457 (D. Md. 1983); Katz v. Abrams, 549 F.Supp. at 671; Dionisi v. DeCampli, 1991 WL 1181850, at *3, amended by Dionisi v. DeCampli,1996 WL  39680; Allen v. Coates, 661 So.2d at 882; Thompson v. Kohl, 453 S.E.2d at 487; United Indep. Ins. Agencies, Inc. v. Bank of Honolulu, 718 P.2d at 1102; Cambron v. Moyer, 519 N.W.2d 381, 383 (Iowa 1994); Smith v. Baker, 715 S.W.2d 890, 892 (Ky. Ct. App. 1986); Bahre v. Pearl, 595 A.2d at 1035;  Schultz v. Schultz, No. 40681, 1981 WL 137977, at n. 7 (Mo. Ct. App. May 26,1981),rev'd on other grounds, Schultz v. Schultz, 637 S.W.2d 1, 7 (Mo. 1982); Stancil v. Stancil, 392 S.E.2d 373, 376 (N.C. 1990); Gross v. Vogel, 81 A.D.2d 576, 577 (N.Y. App. Div. 1981); Domo v. Boulder Bluff Corp., No. 920T065, 1993 WL 527911, at *2 (Ohio Ct. App. Dec. 17, 1993); Jennison v. Jennison, 499 A.2d 302, 304 (Pa. Super. Ct. 1985); Kenney v. Porter, 604 S.W.2d at 302; Wamser v. Bamberger, 305 N.W.2d at 162.

Other courts have indirectly espoused the majority view by finding that Chapter 8 of the UCC applies to transfers of stock in closely-held corporations. See  Baker v. Gotz, 387 F. Supp. 1381, 1389-90 (D. Del. 1975) (finding that

---

[21]In his concurrence to the Court of Appeals' opinion, Judge Susano asserted that he felt bound by the Blasingame decision, but urged the Supreme Court to "revisit Blasingame" because he felt that "the cases espousing the majority view are arguably the better-reasoned cases on the subject at hand."

negotiable instruments were investment securities under Chapter 8 the UCC because they were "of a type commonly dealt in upon securities exchanges or markets," irrespective of the fact that the notes in question were never publicly traded) aff'd mem., 523 F.2d 1050 (3d Cir. 1975); J.M. Prod., Inc. v. Arkansas Capital Corp., 910 S.W.2d 702, 708 (Ark. Ct. App. 1995) (without specifically addressing the issue, finding that closely-held stock was a security under Chapter 8 of Arkansas's UCC); Kiely v. St. Germain, 670 P.2d 764, 769 (Colo. 1983) (holding that Chapter 8 of Colorado's UCC applied to the sale of shares in a corporation whose entire stock was held by one individual); Midfelt v. Lair, 561 P.2d 805, 812 (Kan. 1977) (holding that the statute of frauds of Chapter 8 of Kansas's UCC applies to the sale of 50% of bank's stock); Morris v. People's Bank & Trust Co., 580 So.2d 1037, 1040-41 (La. Ct. App. 1991) (finding that Chapter 8 of Louisiana's UCC applies to an option contract between former bank president and majority stockholder of bank to repurchase a "maximum number of shares" of stock in connection with a contract of employment and that such stock is a security within the meaning of Chapter 8); Thomas v. Prewitt, 355 So.2d 657, 659-60 (Miss. 1978) (holding that the statute of frauds found in Chapter 8 of Mississippi's UCC applies to the sale of shares of stock in a corporation comprised of only twelve shareholders); Young v. Young, 393 S.E.2d 398, 401 (Va. 1990) (analyzing the transfer of closely-held stock as a transfer of securities within the meaning of Chapter 8 of Virginia's UCC but determining that common law rules for gifts also governed the transaction and were controlling in that instance); Yost v. Haun, 512 S.E.2d 228, 231 (W. Va. 1998) (determining that stock pledged by James C. Haun in Haun Holdings, Inc. to his father was a security under Chapter 8 of West Virginia's UCC).

Only Rhode Island currently embraces the minority view that stock of closely-held corporations is not a security for UCC purposes. This view is based on the belief that closely-held stock is not "of a type commonly dealt in upon

15

securities exchanges" and that there is no ready market for the shares.  See Kottis v. Cerilli, 612 A.2d 661, 667 (R.I. 1992); Rhode Island Hosp. V. Collin, 368 A.2d 1225, 1227 (R.I. 1977).[22]

Our formal adoption of the majority rule not only clarifies an area of commercial law that had been marked by some confusion in Tennessee, but it also promulgates the policies and goals underlying the UCC.  One of the UCC's main purposes is "to make uniform the law among the various jurisdictions."  See Tenn. Code Ann. § 47-1-102(2)(c) (1996 Repl.).   Because Chapter 8 of the UCC has been adopted by all fifty states,[23] it is important that Tennessee construe its provisions in accordance with the growing number of states addressing this issue.  This uniformity among jurisdictions will facilitate predictability and ease in interstate transactions.

## E.  Application of the Statute of Frauds

Having determined that Chapter 8 of the UCC governs this case, we now address the defendant's contention that the alleged agreement between the parties does not satisfy the applicable statute of frauds, found at Tenn. Code Ann. § 47-8-319 (1992 Repl. & 1996 Repl.),[24] because no signed writing memorializes its existence.  The plaintiff argues that Tenn. Code Ann. § 47-8-319 (1992 Repl. & 1996 Repl.) does not render the alleged agreement unenforceable because the

---

[22]It is not necessary for us to address the policy debate concerning whether closely-held stock is commonly dealt in on securities exchanges or markets or is commonly recognized as a medium for investment because the Official Comments accompanying our current version of the UCC have specified that closely-held stock is to be considered a security under the UCC.  See Tenn. Code Ann. § 47-8-103, Comments to Official Text, n.2 (Supp. 1998).

[23]See Unif. Commercial Code, 1A U.L.A. 1 (Supp. 1999).

[24]The alleged agreement in this case is governed by Tenn. Code Ann. § 47-8-319 as it existed in the 1992 Replacement volume.  However the statute has not been amended since appearing in that volume, and our analysis also applies to the current version of the statute, found in the 1996 Replacement volume.

16

agreement's terms were reduced to a signed writing and, alternatively, one of the statutory exceptions applies to prove the existence of the agreement. We disagree with both contentions.

The statute of frauds governing Chapter 8 transactions provides, in relevant part:

> A contract for the sale of securities is not enforceable by way of action or defense unless: (a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price . . .

Tenn. Code Ann. § 47-8-319 (1992 Repl. & 1996 Repl.).

The plaintiff insists that ample proof exists, in a variety of forms, to show that an agreement existed whereby he was to receive, as compensation for the financial consulting services he had rendered, eighty percent of the stock in MacTenn and eighty percent of that in MSI. As examples of this proof, the plaintiff recalls comments by the defendant acknowledging such an agreement and asserts that he has seen documents signed by the defendant evidencing an agreement. However, throughout this litigation the plaintiff has failed to produce a single writing, signed by the defendant, contemplating or effectuating the transfer of the stock in question. Without such a writing, the requirements of Tenn. Code Ann. § 47-8-319 (1992 Repl. & 1996 Repl.) are simply not satisfied.

In compliance with the plaintiff's and attorney Gertz's instructions to prepare a series of documents that would facilitate the creation of the new corporations, the defendant did draft a number of documents, including proposed agreements transferring 80,000 shares of MSI stock and 80,000 of MacTenn stock from the defendant to the plaintiff. However the defendant, apparently wary

17

of the plaintiff's motivations concerning the transaction, and under the belief that the documents were part of a mere contingency plan, did not sign the contracts, but turned them over to the plaintiff without his signature.  In the same manner, when the plaintiff and Mr. Gertz requested stock certificates representing certain shares of MSI and MacTenn, the defendant provided only copies of the certificates and hid the originals.

The evidence in the record reveals that the dealings between the parties were unusual, tinged with distrust and perhaps unethical motivations.  An example of this suspicion surrounds the "contingency plan," complete with documents back-dated six months.   While we do not endorse the manner in which these parties chose to transact their affairs, the fact remains that the record contains no writing, signed by the defendant, that evidences an agreement for the transfer of stocks, as required by Tenn. Code Ann. § 47-8-310 (1992 Repl. & 1996 Repl.).

The plaintiff next argues that even if no signed writing satisfies the statute of frauds found in Chapter 8, the alleged agreement to transfer stock is enforceable nonetheless because one of the statute's exceptions to the writing requirement applies in this case.  The plaintiff directs us to the following exception:

> A contract for the sale of securities is not enforceable by way of action or defense unless:
>
> *     *     *
>
> the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price.

Tenn. Code Ann. § 47-8-319(d) (1992 Repl. & 1996 Repl.).

The plaintiff insists that this exception is satisfied because the defendant, in

a deposition in connection with an unrelated case,[25] testified that he owned twenty percent of the stock in MSI and that the plaintiff owned the remaining eighty percent. When asked about this testimony during the trial in this case, the defendant asserted that even though he had not signed the documents that would have transferred the stocks in question, he was under the impression that the contingency the documents were created to address was imminent, and that the stocks would be transferred as soon as he signed the documents. Because the documents were back-dated, he felt that he was "speaking for the future" while testifying in the previous litigation, and so he referred to eighty percent of the stock as belonging to the plaintiff. The defendant now insists that he never signed the documents, after all, and that his previous testimony does not evidence an enforceable agreement between the parties within the meaning of the statutory exception.

After considering the plaintiff's contention, we have determined that the exception found at Tenn. Code Ann. § 47-8-319 (1992 Repl. & 1996 Repl.) is not satisfied. The exception requires that the party against whom the writing is to be enforced admit, in pleadings or otherwise in court, the existence of a contract "made for sale of a stated quantity of described securities at a defined or stated price."[26] As the defendant points out, his deposition testimony in unrelated litigation merely acknowledged (incorrectly, as he contends) that the plaintiff was the owner of eighty percent of MSI, but does not admit the existence of a contract for a specified number of shares, nor does it discuss a price.

We have found no Tennessee cases defining the language, "a contract was made for sale of a stated quantity of described securities at a defined or stated

---

[25]See Bunch v. Macawber Engineering, Inc., No. 91-1374 (D. W. Penn.).

[26]See Tenn. Code Ann. § 47-8-319(d) (1992 Repl. & 1996 Repl.).

19

price," within the meaning of this exception.[27]   However we have determined that the defendant's admission does not satisfy these specific demands.  The statute of frauds' requirements are designed to ensure that some conduct has occurred that guarantees that an agreement has been reached that specifies the quantity and price of the security to be transferred.  Such conduct includes signing a writing evidencing the agreement,[28] delivering the security,[29]  or confirming, in writing, the transfer of the security.[30]  The judicial admissions exception "should be applied only in situations where it constitutes a badge of credibility comparable in strength to the other badges of credibility identified by the [statute of frauds]."[31]

No badge of credibility indicates that the parties in this case formed a legally binding contract.  Despite the defendant's statement during deposition, in an unrelated case, that the plaintiff was owner of eighty percent of MSI's stock, the plaintiff never took or attempted to take control of MSI and no original stock certificates evidencing a transfer were delivered.   While the defendant's statement and explanation of that statement are certainly unusual, the "admission" simply did not acknowledge that a sale contract had been reached for "a stated

_____

[27]Cf. Keigan v. Goode, 556 N.E.2d 118, 119-20 (Mass. App. Ct. 1990) (holding, in a suit to establish the existence of an oral agreement for the sale of stock, that the judicial admission exception was not satisfied by the plaintiff's deposition testimony acknowledging that before negotiations had broken down the parties had reached an agreement with regard to price and quantity of stock and had drafted a document reflecting the agreement); Oakley v. Little, 272 S.E.2d 370, 374 (N.C. Ct. App. 1980) (holding that the judicial admission exception did not apply to prove the existence of an oral agreement for the sale of stock, where the defendant offered his deposition testimony acknowledging that the parties agreed to have a document transferring the stocks drafted by an attorney, because the defendant's references to the agreement were "in terms of a tentative or incomplete agreement" and because "[a]ny admission of such a contract would necessarily have to include a statement of the price and quantity terms"); Nelson v. Brostoff, 689 P.2d 1056, 1060-62 (Or. Ct. App. 1984) (holding, in an action brought by buyers for specific performance of a contract for the sale of stock, that the judicial admission exception was not satisfied by the seller's deposition testimony admitting that after meeting with the buyer he shook the buyer's hand and stated "we've got a deal" because the statement, even when taken in context with the preceding negotiations described by the seller in his deposition, established neither a quantity nor price for the stocks).

[28]See Tenn. Code Ann. § 47-8-319(a) (1992 Repl. & 1996 Repl.).

[29]See Tenn. Code Ann. § 47-8-319(b) (1992 Repl. & 1996 Repl.).

[30]See Tenn. Code Ann. § 47-8-319(c) (1992 Repl. & 1996 Repl.).

[31]See Michael J. Herbert, Procedure and Promise: Rethinking the Admissions Exception to the Statute of Frauds Under U.C.C. Article 2, 2A, And 8, 45 Okla. L. Rev. 203, 209 (1992).

20

quantity of described securities at a defined or stated price."

The intermediate court agreed with the trial court that the record contains ample evidence to prove that the parties reached an oral agreement for the sale of stock. We disagree. As we have already made clear, aside from the lack of a signed writing evidencing an agreement, the parties' actions do not indicate that a contract had been formed. The plaintiff never exercised or attempted to exercise any controlling interest in MSI and / or MacTenn. No certificates evidencing a transfer were delivered. In fact, after exchanging a series of letters that each party concedes did not ripen into an agreement, the parties parted ways.

## CONCLUSION

In sum, we hold that closely-held stock is a security within the meaning of the UCC's Chapter 8, and that the closely-held stock at issue in this case is governed by Chapter 8. Because the plaintiff cannot produce a signed writing that comports with the statute of frauds found at Tenn. Code Ann. § 47-8-319 (1992 Repl. & 1996 Repl.), nor can he satisfy one of the statutory exemptions, we reverse the judgments of the lower courts and dismiss this cause. Costs of this appeal taxed against the plaintiff, Stephen A. Wakefield, for which execution may issue if necessary.

_____
FRANK F. DROWOTA, III,
JUSTICE

21

**Concur:**
Anderson, C. J.
Birch, Barker, JJ, Byers, Sp.J.